## KALMAN STEEL CO. v. ARMSTRONG.

## ARMSTRONG v. KALMAN STEEL CO.

(Circuit Court of Appeals, Eighth Circuit. November 28, 1925.)

Nos. 6954, 6955.

Brokers ⊜86(4)—Evidence held to sustain finding that plaintiff was procuring cause of purchase of stock, entitling him to commission.

Evidence *held* to sustain finding that plaintiff was procuring cause of defendant's purchase of stock, or that defendant prevented his being such by its own acts, entitling plaintiff to commission.

In Error to the District Court of the United States for the Eastern District of Missouri; Charles B. Davis, Judge.

Action by George H. Armstrong against the Kalman Steel Company. Judgment for plaintiff, and both parties bring error. Affirmed.

S. Mayner Wallace, of St. Louis, Mo., for plaintiff.

Montreville J. Brown, of St. Paul, Minn. (William H. Oppenheimer, George W. Peterson, and Frank C. Hodgson, all of St. Paul, Minn., on the brief), for defendant.

Before STONE and VAN VALKENBURGH, Circuit Judges, and PHILLIPS, District Judge.

STONE, Circuit Judge. This is an action by Armstrong against Kalman Steel Company to recover the reasonable value of services rendered at the instance and request of the defendant "in and about the purchase by and for the defendant of the shares of the capital stock of the Corrugated Bar Company." From a judgment, on verdict, for $5,000, cross-writs of error were sued out. The plaintiff states in his brief and argument that, if this court shall determine the issues raised on the writ of the company in favor of him, he is willing that his writ of error should be dismissed. Therefore, we will first examine the matters raised by the writ of the company.

That writ presents really but one point, which is the sufficiency of the evidence to sustain the verdict as to liability. There is no dispute that Armstrong was employed by the company in connection with the purchase of this stock, nor is there any question that the company did purchase the stock. The contention is that the employment of Armstrong was conditioned upon his being the "procuring cause" of the purchase and that he was not such cause. The court charged the jury that Armstrong could not recover unless he were the procuring cause and that it was not enough that he had rendered useful services or had brought together the parties if completion of the transaction were otherwise brought about, unless the employer had terminated the relationship "in bad faith" and as a mere device to escape payment of the broker's commission. The court illustrated what was meant by this exception by saying:

"Thus, if in the midst of negotiations instituted by the broker and which were plainly on the path to success, the seller should revoke the authority of the broker, with a view of concluding the bargain without his aid and to avoid payment of commission yet to be earned, it might be well said that due performance by the broker was purposely prevented by his principal; but if the latter, that is, if the principal acts in good faith, not seeking to avoid payment of commis-

sion, but moved fairly by a view of his own interest, he has the right before a bargain is made and while negotiations remain unsuccessful, before commissions are earned, to revoke the broker's authority, and the latter cannot thereafter claim compensation for a sale made, even though it be with a customer with whom a broker unsuccessfully negotiated, and even though to some extent the principal might justly be said to have availed himself of the fruits of the broker's labor."

While the court gave the above definition of the law, the entire charge conveys the impression that the case was submitted on the theory of whether Armstrong had been the procuring cause of the purchase rather than on the theory that his performance was interrupted or prevented in bad faith by the company.

With the issue thus defined by the charge, we have read and carefully considered the entire evidence to ascertain whether it was sufficient to sustain a verdict of liability. The evidence favoring plaintiff seems to be as follows: The Kalman Steel Company and the Corrugated Bar Company were engaged in the same business, that of jobbers for steel rods or bars used in reenforced concrete construction. In 1919, the stock control in the Corrugated Company was held by the Garrison family (of which Arthur C. Garrison was the dominating force) with the headquarters of the business in St. Louis where the Garrisons lived. At that time, the Kalman Company, acting through the Mercantile Trust Company of St. Louis sought to purchase the controlling stock interest in the Corrugated Bar Company from the Garrison family. In this attempt, it was unsuccessful, the stock being then purchased by two men, Johnson and Kennedy, who were already stockholders in the Corrugated Bar Company. Johnson thus became a holder of the majority of the outstanding stock of the Corrugated Company with Kennedy the second, but much smaller, holder. In July, 1922, Johnson died. In February, 1923, Kennedy wrote Garrison, asking if he would be interested in purchasing control of the Corrugated Bar Company through acquiring the interest of Mrs. Johnson, who had inherited the Johnson stock, and "one or two others who might wish to sell." Not wishing to acquire the stock, Garrison communicated this information to Armstrong, who was employed by the Mercantile Trust Company. Garrison then secured from Kennedy the more detailed information that he had discussed the matter with Mr. Bass who represented Mrs. Johnson's interest and that Bass was willing to recommend to her a sale at $175.00 per share "providing the other stockholders would have the option to sell at the same rate in case they did not wish to continue with the new management." Armstrong and Garrison, evidently having in mind a proposition to buy and resell this stock to the defendant, wired its president, Paul J. Kalman, stating that an opportunity existed to purchase the outstanding stock of the Corrugated at "around $200.00 per share" and asking if he would be interested. Kalman at once replied that he would be interested; would like to have them procure quickly for him comparative financial statements for the past five years in order that he could determine whether the price was attractive; stated that he assumed Mrs. Johnson was the one desiring to sell "as I have had this intimated to me several times recently but displayed no interest" and suggesting that it would be advisable, when they got this information, "not to give them any idea who your client is." To this letter Armstrong promptly replied, stating that he had written for the financial statements Kalman desired; telling him how the matter had arisen through Garrison and that he would conceal the interest of Kalman until an option on the stock was obtained, if Kalman cared to consider the matter after looking over the statements and that he would advise Kalman as to any developments. Various negotiations took place between Armstrong and Garrison on the one side and Kennedy on the other, all of which were promptly communicated to Kalman by Armstrong. On April 18, 1923, Armstrong wrote Kalman enclosing the financial statement of the Corrugated Bar Company which he had obtained from Kennedy, also saying that Kennedy had written that some one else was negotiating for the stock and had urged Garrison "to get into immediate touch with his people." May 1st, Kalman and Armstrong discussed the matter over long distance telephone and thereafter, on the same day, Kalman wrote that he was "interested in this proposition, provided it can be put through at a right price." In the same letter he asked Armstrong to procure other information and stated "I, of course, expect to take care of you and Mr. Garrison if the deal is put through." Further communications continued and Armstrong vainly tried to arrange a meeting, for himself and Garrison, with Kalman. Finally, on May 12, Armstrong wrote suggesting that, "the best thing

to do would be to arrange a conference between yourself and Kennedy of the Corrugated Bar Company to clear up a number of points which at present are at variance."

Kalman was agreeable to this plan and Armstrong finally arranged for a meeting in New York between Kalman, Kennedy and Bass. In a long distance talk, in which Armstrong informed Kalman of the arrangement for the meeting, Armstrong asked Kalmon to protect his commission if the deal went through. The meeting was held about May 20th at New York between Kalman, Kennedy and Bass. The next communication between the parties is a letter of June 7th from Kalman to Armstrong in which Kalman stated: That he had met Bass and Kennedy "representing some of the stockholders of the Corrugated Bar Company, in New York and had a conference with them but did not come to any conclusion. We are still far apart as to our views and in any event, any possible deal we have depends on other developments." He also stated therein as follows:

"You asked me over the telephone, in the event we made a deal with these people, to protect you as to commission. While naturally I would be glad to see you make some money in the event we later effect a deal, I do not see any reason why we as purchasers should pay you any commission, or how we could protect you, and it seems to me you must look to the stockholders of the Corrugated Bar Company for any commission you might get and for the necessary protection."

This was the first intimation that Kalman had not expected to take care of Armstrong's compensation. Thereafter, Kalman negotiated direct with Bass but very apparently with the co-operation and consent of Kennedy in so far as Kennedy's stock was concerned. That is, Bass seems to have conducted the negotiations, on the part of the Johnson stock and some stock represented by Mrs. Bass, and Kennedy accepted the result of those negotiations and turned his stock in on the same price basis that Bass accepted for that of Mrs. Johnson and Mrs. Bass.

This evidence reveals that shortly after the death of Johnson (in July, 1922), a month before Armstrong first wrote Kalman, there had been negotiations for the purchase of this stock in which negotiations Kalman had an active interest though no active participation. At that time, there were three companies engaged in this sort of business: The Kalman Company, the Corrugated Company and the Concrete Steel Company. W. A. Pouch, president of the Concrete Steel Company, was carrying on negotiations on the part of his company and the Kalman Company for the purpose of merging the three businesses. These negotiations were at first between Pouch and Kennedy and later between Bass and Pouch. Pouch was informed by Bass that Kennedy had no authority to represent the Johnson and Bass stocks. Also Bass informed Pouch that his clients were not interested in a merger but only in a sale of their stock for cash. Early in his association with Bass, Pouch became so dissatisfied with the conduct of Bass that he declined to take any further steps. In these negotiations, Kalman was never present and took no open part but everything that took place was communicated to him by Pouch so that he was acquainted with the entire situation. These negotiations between Pouch and Bass were terminated several months before Armstrong first wrote Kalman and Kalman seems to have taken no steps in this interval to purchase this stock on account of his company. It is clear that it was the endeavors of Armstrong which brought Kalman actively into the negotiations and resulted in the New York meeting which was the beginning of the negotiations which resulted in the purchase of the stock. Of all these negotiations by Pouch, neither Armstrong nor Garrison had any knowledge until after the stock was purchased. When we consider that from as far back as 1919 defendant desired to acquire this stock; that apparently, in 1922, it had endeavored again to do so through and with Pouch; that this later attempt had been entirely unsuccessful and negotiations had entirely ceased; that it had apparently been unable to initiate and carry on negotiations therefor by itself; that plaintiff secured valuable information for it and arranged for a meeting between the parties which finally resulted in the purchase; that these last negotiations were aided, in so far as he was permitted to do so, by Kennedy in conjunction with whom plaintiff was acting; that defendant clearly led plaintiff to believe that it would take care of his interest and that he was acting for it until the meeting and that it thereafter effectually prevented his further acting by reversing its position and denying any liability to him; it is difficult to say that the jury was not justified in finding either that plaintiff was the procuring cause of the purchase or that defendant had prevented his

being such by its own acts after availing itself of his services as far as it deemed them useful. In either case, plaintiff was entitled to a recovery and it would be a fraud upon him to permit defendant to escape such liability. While there is much evidence in favor of the latter proposition, yet we cannot say that there was not sufficient evidence to sustain the former, which was the theory submitted in the charge.

Therefore, we think the writ of Armstrong should be dismissed and the judgment should be affirmed.